NelsoN, J.,
delivered the opinion of the Court.
The plaintiff in error was tried and convicted at a Term of the Circuit Court, began and held for the County of Lauderdale, on the first Tuesday after the fourth Mon *205 day in January, 1871, being the same term at which the indictment was found; and it is now insisted that the Court was not lawfully held, because it was not opened on the fourth Monday of the month, the time prescribed by law.[1]
The Act of 30th June, 1870, p. 79, directs that the Circuit Courts for Lauderdale county, shall be held on the fourth Mondays in January, May and September. It is declared in the Code, 4220, that, “it is the duty ot the Circuit Judge to attend and. hold his court at the time appointed by law; but if, for any reason, he fails to appear, the clerk may open and adjourn the court for the first three days of the term; and if no Judge attend by four o’clock on the fourth day of the term, the court shall be adjourned by the clerk, until the [court in course.”
Section 4223 provides, that “none of the proceedings, pending in the Circuit Courts of this State, shall be discontinued by the non-attendance of the Judge at any term, or his death at any time; but, in such cases, all matters depending shall stand continued to the next succeeding term.” And section 4224 provides that “the non-attendance of the Circuit Judge shall not prevent the parties from making up their pleadings in appearance causes.”
In the case of Venable & Co. v. Curd & White, 2 Head, 582, it appeared that the time for holding the 'courts had been changed, by Legislative enactment, from the third to the fourth Monday; and, afterwards, at the *206 same session of the Legislature, from the fourth to the third Monday, and that the Circuit Judge, ignorant of the change, held the court on the fourth Monday. But it was held by this court, that the public acts of officers de facto- are often valid, though the authority under which they act is void, and that public convenience, as well as public justice, require that they should be supported: lb., 585, 586. Judge Wright, in delivering the opinion, said: /‘There can be no doubt whatever, upon reason and authority, that a judgment given by a judge, de facto, sitting and holding the court at the proper time and place, is as valid and free of error as a judgment pronounced by a judge rightfully in office. If so, upon what reason shall we hold that the judgments and decrees of a judge regularly in office are erroneous, because he held his court under color of a law that turned out to be repealed or invalid ?”
Public justice, in our opinion, demands that the views announced in that case shall apply as well to criminal as to civil cases. If it did not, we hold that, as the plaintiff in error went to trial without making any objection to the jurisdiction, he can not now make it under the general motion to quash, entered in the Circuit Court, which does not state any ground for making the motion. In addition to this, it is, by no means, clear that the court was not lawfully and properly holden, although it does not appear that the clerk opened and adjourned the court from Monday until Tuesday. Under the act fixing the times of holding the Circuit Courts in Lauderdale, the court, at which the indictment was found and the cause tried, might have con- *207 tinuecl its sitting until near the third Monday in February, and the legal term would have been from the fourth Monday in January until it was nec'essary to adjourn in order to hold another court commencing on the third Monday in February. The interval between the two periods, or any shorter period during which the term was actually held, would be the legal term of the court; and the judge might, very properly, open the term at any time between the day designated by law and the fourth day, when it was the duty of the clerk to adjourn the court sine die. Under section 4224, the term was open for the purpose of making up the pleadings in civil suits; and section 4220 expressly treats the four days as parts of the term. Section 4223 guards against a discontinuance on account of the non-attendance of the Judge at any term, but evidently implies that he may attend and commence the term, by presiding in court at any time before four o’clock of the fourth day, when the clerk is compelled to adjourn it. If he does not attend before the prescribed hour of the fourth day, then, but not until then, the term is at an end; and, under section 4224, all matters depending stand continued until the next succeeding term.
The bill of exceptions states, that, ‘The jury returned into court and rendered a verdict that they found the defendant guilty of petit larceny, and assessed the term of his imprisonment, in the Penitentiary of the State, for the period of two years and six months, when the court directed the jury to remodel their verdict; that they could not return fractions of years; and directed them to return and reform their verdict in that respect. *208 The jury, after retiring, returned into court and rendered the following verdict: ‘We, the jury, find the defendant guilty of petit larceny and fix his term of imprisonment, in the Penitentiary of the State, for the term of three years/ which verdict was received by the court and the jury discharged; to all of which, defendant excepted. At a subsequent day of the court, the defendant moved the court for a new trial of the issues herein, and in arrest of judgment; which motions were, by the court overruled; and the court proceeded to pronounce judgment, sentencing ■ the defendant to imprisonment in the Penitentiary for the term of two years and six months; to all of which, as well as the charge of the court, the defendant excepted.” It is earnestly contended, for the plaintiff in error, that this action of the Circuit Court was so erroneous, that it entitles him to a reversal of the judgment.
Under the provision of our Constitution, that “Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law,” there are no duties of a Circuit Judge which are, perhaps, so delicate, or difficult, as those which concern the maintenance of the exact relations between the court and the jury, especially in criminal cases; but we do not perceive that the court invaded the province of the jury in this case. It was, unquestionably, his duty, in instructing the jury as to the law, to state its provisions, as to the term of imprisonment, and to leave it to them to determine it in the event they found the defendant guilty. His instruction, that the jury could not find a term of imprisonment for a certain term of years and *209 the fraction of a year, within the time prescribed by law, was clearly erroneous, as it was competent for the jury, in their discretion, to fix any period between the lowest and the highest number of years designated in the statute. But it is very manifest that he corrected the error; for the verdict, as entered upon the minutes, shows that “the jury, upon their oath, do say they find the defendant, John Henslie, guilty of petit larceny, and assess the term of his imprisonment in the State Penitentiary, at two years and six months.” Had the court received and acted upon the second verdict, and sentenced the defendant to three years’ imprisonment, it would have been such an error against him, as that the judgment should be reversed, or, at least, under our statutes, corrected by this court. But there can be no question, upon the bill of exceptions, that the jury, on each occasion, returned a verdict that they found the defendant guilty of petit larceny; nor can it be doubted that, in their first verdict, they fixed the term of imprisonment at two years and six months; but, under the erroneous instructions, returned a verdict, on the second occasion, fixing the term at three years. Neither verdict, under our practice, could have been, immediately, entered upon the minutes, or record book, of the court, as it is well known, that, in practice, the daily proceedings are briefly entered by the clerks upon their “rough minutes,” or memoranda, which form no part of the record, and are, generally, entered, at large and in proper form, upon the record book between the time of the -adjournment of the court ou the day of the proceedings and its meeting on the next day; when, by express statutory provision, the record, thus *210 carefully prepared, is required to be read in open court, before it is signed by the judge, not only with a view to tlie correction of any errors, or mistakes, which may have been committed by the clerk, but for general information. During tbe term of the court, tbe record is entirely within the control of the presiding judge; and no good reason exists why, in a case like this, be might not correct his own error by causing the record to show the result ascertained by the first verdict, and treating as a nullity the subsequent action of the jury occasioned by his own mistake. The record, as finally made up, does not speak falsely, as it is expressly shown in the bill of exceptions that the jury did return tbe verdict there entered, and that the second verdict, if it may be so styled, was a repetition of tbe first, with the erroneous addition of six months’ imprisonment, which was reduced by tbe court, in favor of tbe prisoner, and before making up tbe record, so as to conform to the first, and only proper, verdict of the jury.
There is nothing in the opinion, in Dougherty v. Shown, which militates against this conclusion, for it is there expressly said that “the verdict of the jury, as originally returned, was their deliberate view of the justice of the case, and no one had the right to interfere with their conclusions”: 1 Heisk., 305. In that case, it seems that the jurors were re-asseinbled, after rendering their first verdict, and that there was, perhaps, an improper interference on the - part of the Attorney for the plaintiff, and that the court, against the express objection of the defendants, proceeded to give an additional charge, under which the first ver- *211 diet, which was against two of the joint defendants for night hundred dollars damages, and against three other joint defendants for five thousand dollars damages, was, after the jury had retired twice, changed to a joint verdict against all the defendants. The jury believed that separate damages should be assessed, but, under the instructions of the court, were compelled to change their verdict entirely, as to the defendants whom they believed least guilty, and to involve them in the same category as the other and most guilty defendants, and thus to render a verdict to the prejudice of the least guilty parties. But here there was no change to the prejudice of the defendant. The jury, on both occasions, found him guilty; and the injury which would have been done by the last action of the jury, if it had been adopted by the court, was not done; and. the first verdict of the jury, which was properly rendered, and was, in fact, the only action that can be-denominated a verdict, was correctly entered upon the-record as their action.
Among other things, the court charged the jury that, “it makes no difference, as to- his- guilt; what sort of an impulse controlled him, nor how strong-that impulse was, nor what produced it. The only question for yon to look at, in considering whether he is guilty of larceny, is, did he know, at the time that-he took the gun, it was not his’?- It is argued, for the plaintiff in error, that if the impulse to take- thn gun was irresistible and “the m-an had no power- to control his will,” there could be no felonious intent. But the-facts presented in this record do not show a case ©£ *212 kleptomania, and it is not necessary to consider tliat occult and mysterious subject. The material facts of the case are few. It appears that the plaintiff in error, who was a stranger to J. A. Campbell, the prosecutor, was at the prosecutor’s store on three consecutive days, about the 20th January, 1871; that he was drinking, and perhaps intoxicated; that he went with the clerk to the dwelling house, where he took supper and remained until 9:30 o'clock, P. M.; that the prosecutor invited him to remain all night, without charge; that by this time he was nearly sober, and returned with the clerk to the store; that he and the clerk went back to the house about ten o’clock, when the clerk showed him the room in which he was to sleep; that he remarked he would not go to bed for about two hours, as he wished to read a book; that the clerk closed the door and left him; that he returned early next morning to wake him for breakfast, but found he was gone and that the bed had not been occupied, and then discovered that the shot gun belonging to the prosecutor, and which he had. seen on the previous morning, was missing. The discovery was made on Friday morning. Pursuit was made, and the plaintiff in error was arrested on the next day, about twenty-two miles distant, at the house of a negro man named Florence, when he acknowledged he had taken the gun and also a book and coat; but said that if it had h'ot been for whisky he would not have done it. It is in evidence that on Friday morning, between the hour of midnight and daybreak, the plaintiff’ in error stopped at Lowery’s house, about five miles distant from the prose *213 cutor’s, liaving the gun with him; that he said it was worth twenty-five dollars, but offered to sell it to Lowery first for ten, then for eight,' and last for four dollars cash and to wait for the balance; that defendant was not drunk at the time, but remained and took breakfast with the witness. At about one or two o'clock on Friday, the plaintiff in error stopped at the house of McGuire, about four miles from Fulton, having the gun with him and again offering to sell it. He was not drunk or drinking at the time, and left there on Saturday morning, starting towards Fulton. Florence (the negro) states that he met the plaintiff in error at the twelve mile post from Fulton; that he stopped witness and asked him where he could stay that night, and stayed at the house of witness, with whom he made an arrangement to assist him across the Mississippi river next morning; that he had a bottle about half full of whisky, and “was merry and drinking, but not drunk;" that he got another bottle and became “pretty drunk;” that he was arrested next morning before day by those who were in pursuit, and that part of the Avhiskey was then still in the bottle.
His Honor, the Circuit Judge, expressly instructed the jury that, “if the defendant was so much under the influence of whisky as not to be conscious of what he was doing when he took the gun, (if the proof shows he did take it,) then the defendant would not be in a condition of mind to be guilty of larceny,” and, in other respects, fully and fairly submitted the case to the jury. The charge was more favorable to the plaintiff in error than he was strictly entitled to in view of his voluntary *214 drunkenness. There is nothing in the record to show that he suffered from delirium tremens or other mental incapacity. It appears from the weight of evidence that he was sober when he took and carried away the gun, and also when he offered to sell it; and if his mind was in any way affected by his potations, the arrangement he made to cross the Mississippi river clearly shows that there was “method in his madness.”
Two physicians were examined on the trial as to the probable effect of the use of spirituous liquors for several days upon the mind of complainant, one of whom stated that he would consider' him morally responsible; and the other that “he would suppose that defendant’s nature, in this respect, was somewhat impaired.” While nothing can be more cruel or inhuman than the punishment, under the forms of law, of one who is an imbecile, or of unsound mind, and is incapable of discriminating between right and wrong, a guilty defendant should not be permitted to escape upon the mere abstract and hypothetical opinions of j)hysicians Avho often disagree, as in this case, in their conclusions.
The case was fairly submitted to the jury, who reached a correct conclusion, and there being no- error in the record,, the judgment is affirmed..

 See Blynn v. Com’l, Law Reg. for Sept. 1871, 577. (Ky.)